# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

| | |
|---|---|
| CELLO PETTIFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 02 C 1777 |
| MICHAEL SHEAHAN, COOK COUNTY | ) |
| SHERIFF; COOK COUNTY, ILLINOIS; | ) Judge Robert W. Gettleman |
| RICHARD REMUS; and JAMES EDWARDS. | ) |
| | ) |
| | ) |
| Defendants. | ) |

DEC - 2 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## FIFTH AMENDED COMPLAINT

Plaintiff, Cello L. Pettiford, by and through his attorneys, complains against Cook County Sheriff Michael Sheahan; Cook County, Illinois; Richard Remus; and James Edwards, and states as follows:

### PRELIMINARY STATEMENT

1.      This lawsuit arises out of an unprovoked and malicious beating perpetrated by a special team of armed guards against Pettiford, a former detainee at the Cook County Department of Corrections (the "CCDOC," "Jail" or "Cook County Jail"). Though Pettiford was seriously injured from the beating, Jail guards ignored his pleas for medical care, and continued to deny him appropriate medical treatment despite doctors' orders. Rather than abide by their obligations and responsibilities to safeguard Pettiford, Jail guards responded to his grievances by destroying his personal property and legal materials, by continuing to assault him, and by denying him access to the law library. Employees of the Cook County Sheriff's Office and Cook County attempted to conceal the guards' actions pursuant to an official policy of the Cook County Sheriff's Office and Cook County to cover up incidents of serious misconduct and abuse. Defendants' attempts to cover up their actions by intimidation, obstructing official

investigations, consistently destroying Pettiford's property and impeding Pettiford's access to the court system constitutes a violation of federal law.

2.     The lawsuit seeks damages for:  (1) the use of excessive force and the failure to intervene to prevent the use of excessive force by others in violation of the Fourteenth Amendment to the United States Constitution; (2) the denial of adequate medical care in violation of the Fourteenth Amendment to the United States Constitution; and (3) the cover-up of the use of excessive force pursuant to an official policy of the Cook County Sheriff's Office and Cook County resulting in a denial of access to the courts in violation of the First and Fourteenth Amendments to the United States Constitution.  It also seeks payment from Cook County for any tort judgment for compensatory damages and associated attorneys' fees and costs.

## JURISDICTION AND VENUE

3.     This action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction over Pettiford's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

4.     Venue is proper is this judicial district pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Pettiford's claims occurred in Cook County, Illinois.

## PARTIES

5.     Plaintiff Cello L. Pettiford was a pre-trial detainee at CCDOC at all relevant times herein.  Pettiford was continuously incarcerated between April 4, 1995 and May 26, 2000 and between February 22, 2001 and November 25, 2002.

6.     Defendant Michael Sheahan was, at all times relevant herein, the Sheriff of Cook County.  As the duly elected Sheriff of Cook County, Sheahan operates in his official capacity as the Cook County Sheriff's Office (the "Sheriff's Office").  He is also the custodian of the CCDOC, where he was given custody and charge of Pettiford and was responsible for

2

Pettiford's protection during Pettiford's incarceration, as well as for the hiring, training and supervision of all personnel necessary to operate and maintain the CCDOC. He has final decision-making authority for establishing policies at the CCDOC, including the policies for dealing with complaints of excessive force. He is sued in his official capacity.

7.     Defendant Cook County, Illinois ("Cook County") is a local public entity under the laws of the State of Illinois.

8.     Defendant Richard Remus was, at all times relevant herein, the Superintendent of or an officer in CCDOC's Department of External Operations (the "DEO"), responsible for the training and supervision of all personnel therein, including, but not limited to, the Special Operations Response Team ("SORT"). He is sued in his individual capacity.

9.     Defendant James Edwards was, at all times relevant herein, a Divisional Superintendent, responsible for the day to day operation of Division 9, CCDOC, with responsibility over the personnel employed therein, and over the detainees within the Division. He is sued in his individual capacity.

10.     All individual defendants were acting within the scope of their employment at the times of the incidents giving rise to the causes of action stated herein. All defendants have acted and continue to act under the color of law in the State of Illinois at all times relevant to this complaint. Their deprivations of Pettiford's constitutional rights are set forth in the following statements of facts and causes of action.

## STATEMENT OF FACTS

**The February 24, 1999 Beating**

11.     On or about April 5, 1995, Pettiford was detained at the CCDOC pending trial.

3

12.     In July of 1996, Pettiford was transferred to the Illinois Department of Corrections ("IDOC"), following a guilty finding on the charges against him. In May of 1998, the Illinois Court of Appeals reversed Pettiford's conviction and remanded Pettiford to CCDOC pending a new trial. Pettiford returned to CCDOC custody in August of 1998.

13.     In February 1999, Pettiford resided in Tier 2H of Division 9 of the CCDOC. On February 21, 1999, Jail officials placed Division 9 on "lockdown," thereby confining the inmates to their cells for 23 or 24 hours of the day.

14.     In the early morning of February 24, 1999, members of SORT conducted a "shakedown" of Division 9. The SORT detail searched cells for weapons, drugs, and contraband. During that search, they disposed of prisoners' possessions and accosted prisoners. After an extensive search, the SORT officers left. The Division remained locked down after the search.

15.     Later that day, as many as 40 SORT officers, accompanied by approximately four unmuzzled guard dogs, returned to Division 9. The SORT detail was led by Defendant Remus. After requiring the assigned tier officers to unlock the cells, the SORT detail ordered those guards to leave.

16.     In Tier 2H, three or four SORT officers entered Pettiford's cell and struck him in the face and body with gloved fists. Other SORT officers entered Pettiford's cell and beat him on his head, neck, and body as they forced him out of his cell. Defendant Remus struck Pettiford in the head with a gloved fist, and ordered Pettiford to go to the wall opposite his cell. Other detainees were thrown from their cells, repeatedly hit, and made to stand along the wall by SORT officers.

17.     After Defendant Remus and other SORT members forced Pettiford from his cell, they trashed his personal belongings, including his papers, legal materials, photographs

4

of his children, and personal effects. SORT guards threw away or destroyed his possessions - throwing some into the toilet - rendering them unusable.

18. Various SORT officers hit Pettiford with their fists and with a wooden baton on his head, back and neck to the point that he urinated on himself. He was forced to recite profanities, including the phrase "SORT runs this motherfucker."

19. In the middle of the dayroom outside of Pettiford's cell, in front of at least one female K-9 officer, SORT officers ordered Pettiford to strip, ostensibly so SORT officers could check him for gang tattoos. Made to stand naked, Pettiford was threatened by unmuzzled guard dogs while SORT members laughed and shouted obscenities.

20. During the incident, Defendant Remus, the leader of the SORT detail, climbed on a table and loudly told Pettiford and others that "I get paid whether I come here or not. You can get paid when I leave, 'cause I don't give a damn about lawsuits. We're going to kick your ass every time we have to come here."

21. SORT officers ordered Pettiford to return to his cell but continued the attack, striking him in the back with a baton and knocking him to the floor of his cell as they locked him in.

**Defendant Edwards And Others Deny Pettiford Medical Care**

22. Seriously injured, Pettiford had a seizure and lost consciousness. His cellmate continually requested for medical care for him. Jail guards ignored the pleas.

23. Finally, after the shift change several hours later, certain tier officers entered Pettiford's cell and found him semi-conscious and in tears.

24. Belatedly, the officers summoned paramedics from Cermak Health Services ("Cermak"), a subdivision of Cook County that provides medical services for detainees. The paramedics took Pettiford to the Cermak medical facility, where Dr. Rami Doukky

5

diagnosed him with blunt head trauma and a concussion. The paramedics transported him to the Cook County Hospital's Emergency Trauma Center. The Trauma Center confirmed the diagnosis and placed him under observation.

25.     Cook County Hospital released him the next day with written follow-up instructions for medical care. Though Defendant Edwards and other Jail personnel were specifically informed of Pettiford's need for treatment, they did not comply with the care guidelines issued by the hospital.

26.     Pettiford received no medical attention between February 25, 1999 and March 2, 1999. On or about March 2, 1999, Pettiford managed to get a message to Doctor Ann Dunlap in the Division 9 dispensary that he required treatment for periods of severe headache, dizziness and frequent vomiting. Dr. Dunlap treated Pettiford for post-concussion syndrome and gave him an appointment card to be seen nightly and monitored for the next one or two weeks. The guards ignored Dr. Dunlap's orders.

**Pettiford's Grievances Are Ignored**

27.     On or about February 27, 1999, Pettiford filed an emergency grievance concerning both the February 24, 1999 SORT attack and the subsequent lack of medical care. He received neither a response nor an acknowledgment from the Jail administration.

28.     In desperation, on March 24, 1999, Pettiford filed a lawsuit in the Circuit Court of Cook County (the "State Court Action"). On April 15, 1999, Pettiford was interviewed for the first time by the Jail's Internal Affairs Division. With no further follow-up from the Jail, Pettiford filed a second grievance about the February 24, 1999 incident on March 22, 2000.

29.     On March 27, 2000, Pettiford received a written response informing him that Internal Affairs would investigate his grievance. That investigation had not been concluded

at the time Pettiford was discharged from CCDOC more than two years later, on November 25, 2002.

### SORT, The CCDOC, And The Sheriff's Office Retaliate Against Pettiford For Filing Grievances And A Lawsuit Concerning The February 24 Beating

30.     By January 2000, Pettiford was assigned to Tier 1F in Division 9. On or about January 27, 2000, while he was sleeping, Pettiford's cell was electronically opened, and three SORT members entered his cell and hit and choked him.

31.     Pettiford filed an institutional grievance complaining of the continued batteries inflicted upon him by Sheriff's deputies, but the grievance went unanswered.

32.     Jail and/or SORT officers routinely destroyed Pettiford's legal materials, papers, and personal effects. Photocopied law cases, personal books, and legal assistance manuals were all confiscated or destroyed. Further, CCDOC guards denied Pettiford regular access to the law library, even after the courts ordered that he be permitted to use it. Defendants' pattern of activity persisted throughout 1999 and 2000.

33.     On or about February 14, 2000, while assigned to Tier AH in Division 11, Jail officers again beat Pettiford, slamming his head into a wall and forcing him to strip naked.

34.     Pettiford filed an institutional grievance complaining of the battery as well as the destruction of all his legal materials and documents. This grievance also went unanswered.

35.     In April of 2000, still suffering from the repeated assaults, Pettiford accepted a plea agreement of time served and was subsequently transferred to IDOC where he was released on May 26, 2000.

36.     On or about February 22, 2001, Pettiford was again detained and held at the Cook County Jail.

37.  On or about August 23, 2001, while Pettiford was assigned to Tier CD, Division 11, Division 11 Superintendent Henry Troka received a notice that Pettiford was to be deposed in connection with the State Court Action on August 30, 2001. Supt. Troka failed to forward the notice to Pettiford until the evening before the deposition was to be given. Pettiford proceeded to give his deposition at the scheduled time, but complained to the State's Attorney representing the defendants in the State Court Action about the tactics being employed against him, including the refusal by Supt. Troka and other Jail personnel to honor Court-ordered law library access and their attempts to thwart Pettiford's attempts to effectively litigate his claim.

**Defendants Make A Concerted Effort To Cover Up The February 24, 1999 Beating And To Block A Truthful Investigative Report About The Beating**

38.  Defendants attempted to cover up or deny the February 24, 1999 incident as soon as it happened. Defendant Edwards, in concert with others, altered or made incorrect entries in log books and records to give the appearance that the SORT unit was not in Division 9 on February 24, 1999 and that there were no incidents to report that day. Also, despite CCDOC's requirement that guards write reports when they use force against detainees, none of the SORT members, including Defendant Remus, wrote reports regarding the February 24, 1999 incident in Division 9. Further, Defendant Edwards and others denied Pettiford and other victims necessary medical care in order to hide the incident.

39.  Defendants operated in concert to try to conceal the February 24, 1999 beatings by SORT members from internal and external investigators and to attempt to keep the internal investigation from reaching resolution.

40.  On information and belief, Jail personnel were aware that there would be legal consequences of the February 24, 1999 incident shortly after it happened. On or around

March 1, 1999, the John Howard Association for Prison Reform wrote a letter to Jail personnel requesting an investigation into the February 24, 1999 incident.

41. Two days later, Investigator Charles Holman was directed by court order to photograph the injuries of detainee Bert Berrios. Holman noted that Berrios had a black eye, extensive bruising, and what appeared to be rope burns around his neck.

42. On March 15, 1999, the investigation was assigned to Investigator Rudolpho Gomez. A month later, with little progress made, the investigation was reassigned to Holman, though the photographs of Berrios were not contained in the file. Instead, Holman received an undated letter from Defendant Edwards, saying that he had found only a small bruise on Berrios' right wrist.

43. Although Holman attempted to conduct the investigation, he was hampered by institutional resistance. Nevertheless, Holman interviewed more than 35 of the detainees who had been victims of the February 24 incident. Holman also reviewed officers' logs, finding discrepancies between the statements of SORT officers and those of the regular tier officers. Despite discrepancies in the logs, the logs did confirm that SORT officers, accompanied by canine handlers, entered Tier 2H on the evening of February 24, 1999, and that afterwards detainees had requested medical attention.

44. Holman completed his preliminary report on June 20, 1999. At the same time, the chief of operations for CCDOC contacted Holman's direct supervisor and questioned the basis of the report and the authority to conduct such an investigation. Though the report was promptly forwarded to the Sheriff's inspector general with a notation that further inquiries should be made, the investigation lay dormant for nearly two years.

45. In or around May of 2001, Holman was ordered to take a copy of the report to the Sheriff's inspector general. A few days later, the inspector general directed Holman

9

to re-open the internal investigation. Upon recommencing his investigation, Holman interviewed more than 20 CCDOC employees who witnessed relevant events, nearly 50 CCDOC employees accused of participating in the beatings, and an additional 8 to 10 witnesses who had been detained at the Jail on February 24, 1999.

46.     Personnel employed by Cook County also hindered the investigation. These personnel included (1) Cermak paramedics responsible for treating the inmates beaten on February 24, 1999, including R. Cervantes, M. Judkins, Gerald Logue, Jim Rausch, Robert Rosol, and Ben Ybarra; (2) their supervisors, including Steve Fullilove, former Cermak Health Services Medical Director Leonard Bersky, and interim director of Cermak's Correctional Medical Technician Department Howard Hradek; and (3) Cook County administrators, including former Cook County Inspector General Timothy Flick. The paramedics failed to initiate triage and medical reports for the inmates who were treated. In addition, despite Holman's request, the paramedics refused to participate in an interview with Holman, and Flick, Fullilove, Bersky and Hradek refused to require them to cooperate with the investigation. The Cook County State's Attorney's Office declined to issue subpoenas to require the paramedics to appear for questioning.

47.     Other CCDOC employees also attempted to hinder Holman's investigation. For example, Saul Weinstein, who was chief of IAD and Holman's supervisor, pressured Holman to provide interviewees with his questions ahead of time and urged him to downgrade the report's proposed charges.

48.     Nevertheless, Holman's report recommended charges against ten CCDOC employees and eight employees of Cook County who worked at the Cermak medical facility.

49.     The report alleged twenty-nine violations against Defendant Remus, concluding that he had entered Division 9 "with the intention of administering corporal

10

punishment," had failed to "enforce humane treatment . . . by directing his SORT supervisors and SORT Team Members to administer corporal punishment to detainees," and had personally administered corporal punishment to detainees, including Pettiford.  The report also described violations by nine other CCDOC employees, including Defendant Edwards, for filing false reports covering up the incident, and for bringing dogs into the detainees' living units.  The report concluded that the violations by five of the officers and Defendant Remus were so serious that they should be fired.

50.    The report also found that the actions of Cervantes, Judkins, Logue, Rausch, Rosol, Ybarra, Fullilove, Bersky and Hradek described in paragraph 46 above were so serious that their conduct should be investigated by Inspector General Flick.  On information and belief, Flick never conducted the recommended investigation and none of the employees was ever disciplined.

51.    Pettiford did not learn the full extent of the attempted cover-up described above until late 2002, around the time that Holman's final report was completed.

52.    Under Sheriff's Office procedures, the inspector general needed to approve Holman's report before Jail administrators would consider acting on its recommendations.  The attempted cover-up continued, with the inspector general delaying any conclusion on the finished report.  Had not the *Chicago Tribune* inquired about the February 24, 1999 incident in late February 2003, the pattern and practice of obstructing the report's publication and effect would have continued.  Not until late February 2003, approximately four years after the beating, and under substantial media pressure, did the inspector general hurriedly finalize the report, sustaining charges against only five officers and one former CCDOC employee, and only for violating operating procedures but not for using excessive force.  None of the employees was fired, as Holman's report had concluded some

11

should be. In addition, while the report was pending, several of the employees whom Holman had recommended for discipline were promoted.

53. While Holman's report was awaiting approval from the inspector general, Holman was harassed and intimidated by Sheriff's Office employees in an effort to discourage him from inquiring about the report or seeking to have it finalized. This effort included the appointment in October 2002 of Juan Frank Diaz as acting director of IAD, to succeed Weinstein. Even though Diaz was one of the officers against whom Holman had recommended charges, Diaz was assigned to be Holman's supervisor. Diaz continued as acting chief of IAD until the *Tribune* printed a story about Holman's report. Only then was he removed from this position. Today, Diaz remains employed by CCDOC as a sergeant, a promotion he received after the February 24, 1999 incident.

54. The extensive, ongoing cover-up of the February 24, 1999 incident has damaged Pettiford's ability to pursue his claim about that incident. Because of the delay and other obstructive tactics used by defendants and others acting in concert with them, Pettiford's claim of excessive force is confined to one person, Defendant Richard Remus, even though numerous officers used force against him or stood by and failed to intervene while others used it, and he could have identified some of those officers and named them as defendants without running afoul of the statute of limitations if he had seen photographs of them in a timely manner. The cover-up also has limited the evidence that Pettiford can present in support of his claim against Remus, since defendants have fabricated evidence he will need to explain at trial, and since the delaying tactics of the cover-up have taken their toll on the memories of honest witnesses, including Pettiford.

55. When Pettiford was beaten in February 1999, he saw several officers who hit him or stood by while it happened, but he could identify only one: former Supt. Remus. The

12

others he saw clearly on the tier that evening but was unable to identify at that time include SORT officers Hampton, Rosario, Martinez, Garcia, and an officer he was never able to identify by name who hit him with a baton.

56.     The only SORT officer Pettiford named as a defendant in the State Court Action was Defendant Remus. While that lawsuit was pending and after he filed this lawsuit, Pettiford attempted to identify other officers accurately so that he could add them as defendants. Because the IAD investigation lay dormant from June 1999 to May 2001 and because the defendants in the State Court Action refused Pettiford's request that they  produce identifying photos of the SORT officers, Pettiford was not able to view the photos of those officers until the spring of 2002, more than three years after the incident. At that point, he was able to match names and photos of all SORT officers who had hit him, except for the officer who hit him with the baton. But by then it was too late; the statute of limitations had passed.

57.     Had the Sheriff's employees not delayed the IAD investigation and not taken other steps to cover-up SORT's use of excessive force, the results would have been different. Officers Hampton, Martinez, and Garcia would have been properly named as defendants in Pettiford's lawsuit. So might have the officer who hit him with a baton, since Pettiford might have been able to identify him had he seen photos earlier. So might have Sgt. Rosario, whom Pettiford had identified as someone who was in a position to intervene and halt his fellow officers' use of excessive force, since the seriousness and validity of Pettiford's case would have become known and Pettiford might have secured a lawyer who could have advised him that Sgt. Rosario's conduct also violated his rights.

58.     The cover-up also limits Pettiford's ability both to present his claim in this case against Defendant Remus and to achieve the full measure of punitive damages he deserves from Remus. Because Defendants and others have fabricated evidence, Pettiford will need to

13

explain SORT records that falsely claim that the Division 9 inmates were unruly and Division 9 logs that disguise SORT's entrance onto the Division 9 tiers. He will contend with supposed memory lapses from paramedics who could not have feigned that excuse if they had been interviewed promptly. He will face medical logs plainly calculated to minimize injuries, including his own. And finally, he will contend with his own memory loss and that of other honest witnesses after six years – memory loss caused by the defendants' calculated, deliberate efforts to delay and frustrate Holman's investigation and Pettiford's efforts to pursue a lawsuit based on the defendants' violation of his rights on February 24, 1999.

**The Cover-Up Is An Official Policy Of Defendants Sheahan And Cook County And Has Been Affirmed By Defendant Sheahan**

59.     The acts described above are part of an institutional practice or custom, constituting an official policy of the Sheriff's Office of covering up of instances of serious misconduct, especially the use of excessive force, by CCDOC and/or SORT guards, and of sanctioning repeated interference by guards into detainees' abilities to pursue their legal claims about the misconduct.

60.     On information and belief, Defendants Sheahan and Cook County had prior notice of the propensity of Sheriff's Office and Cook County employees to cover-up excessive force by CCDOC correctional officers but took inadequate steps to train and supervise these employees, correct their abuse of authority, or implement meaningful procedures to discourage their unlawful abuse of power. The failure to properly supervise and/or train the employees included the failure to properly instruct them in applicable provisions of the Illinois Administrative Code, State Penal Law and proper investigative procedures.

61.     On information and belief, Defendants Sheahan and Cook County tolerated, as institutional policy, practice, or custom, or authorized and ratified the systematic

pattern by their employees of covering up the excessive use of physical force and destruction of personal property and legal materials by correctional officers, with the intention of and/or having the effect of depriving Pettiford and other detainees of their rights and privileges afforded them by the United States Constitution.

62. The effect of this policy was to deny Pettiford meaningful access to the courts by causing him to lose opportunities to pursue his claim about the events of February 1999, as more fully described above.

63. The practice or custom includes the following tactics by the Sheriff's Office, which are used so frequently that they amount to an official policy of the Sheriff's Office:

a. Falsifying or failing to write proper reports, including incident reports and log book entries, with the aim of covering up the use of excessive force;

b. Retaliating against inmates who complain about the use of excessive force by such techniques as denying them proper medical care and destroying their personal property;

c. Responding to Pettiford's and other detainees' complaints of misconduct, including excessive use of force, with inadequate investigations and grievance responses which are calculated to mislead the public and which show a deliberately indifferent attitude towards official misconduct;

d. Providing no protection for Sheriff's Office investigators such as Holman to conduct proper investigations of allegations of excessive force, but instead permitting harassment and intimidation of the investigators;

e. Allowing correctional officers being investigated for serious charges of excessive force to continue working – and even receive promotions – while the investigations are ongoing;

15

f.   Failing to remove officers from assignments in which they come in contact with detainees while they are being investigated for serious charges such as the use of excessive force;

g.   Delaying investigations for months and even years, during which time the individuals being investigated may receive promotions and may continue to work in situations where they are exposed to detainees, while the statute of limitations on criminal charges against the officers continues to run or expires;

h.   Providing no protection or incentives for employees who witness excessive force to cooperate with investigations by telling the truth about what they saw or to report instances of excessive force they learn about, and instead providing incentives for covering up excessive force;

i.   Creating an atmosphere where medical personnel at Cermak are discouraged from treating inmates' injuries from excessive force promptly and adequately, from documenting the injuries appropriately, and from cooperating with investigations by telling the truth about the injuries, and instead providing incentives for Cermak personnel to cover up excessive force;

j.   Failing to support investigators who conduct competent, thorough investigations and instead undermining their authority by refusing to sustain recommended charges or downgrading them; and

k.   Failing to provide serious punishment when charges of excessive force are sustained but instead providing trivial punishment that is not designed to act as a deterrent to the use of excessive force and in fact does not deter it.

64.   The practice or custom includes the following tactics by Defendant Cook County, which are used so frequently that they amount to an official policy of Cook County:

a.   Providing no protection or incentives for medical personnel at Cermak to treat inmates' injuries from excessive force promptly and adequately and to

16

document the injuries appropriately, and instead providing protection for medical personnel to refuse treatment and falsify or omit documentation of medical care;

b. Providing no protection or incentives for Cermak medical personnel who have relevant information about incidents of excessive force to cooperate with investigations by telling the truth about what they saw or to report incidents of excessive force they learn about, and instead providing incentives for covering up incidents of excessive force;

c. Failing and refusing to require the Cook County inspector general and Cermak supervisors to institute procedures and set up guidelines that would require Cermak medical personnel to cooperate with the Sheriff's Office's investigations of excessive force by CCDOC guards; and

d. Failing to implement and utilize a valid investigative procedure by the County itself, instead of by the Sheriff's Office, for investigating possible misconduct by Cermak medical personnel at Cermak in dealing with injuries that may be caused by the use of excessive force by Jail guards.

65. The practice or custom also has been ratified by Defendant Sheahan, who is the person with final decision-making authority for policies governing the use of excessive force and the investigation of incidents of excessive force at the Cook County Jail. On or about September 17, 2004, Defendant Sheahan told news reporters, "no credible evidence that the investigation [of the February 24, 1999 incident] was covered up" exists. This statement flatly contradicts the extensive credible evidence that the investigation of that incident was in fact covered up. Defendant Sheahan's statement amounts to an act in furtherance of the cover-up and concealment of the use of excessive force on February 24, 1999, and reflects the official policy of the Sheriff's Office of covering up instances of excessive force.

17

## COUNT I

### Section 1983 Claim Against Defendant
### Remus For Use Of Excessive Force And Failure To Intervene

66.     The allegations of paragraphs 1 through 65 are incorporated herein by reference.

67.     As described above, Defendant Remus used excessive force against Pettiford on February 24, 1999, without provocation and without legitimate penal justification, and also failed to stop the unprovoked and unjustified use of excessive force against Pettiford.

68.     The actions of Defendant Remus were performed under color of state law, and violated Pettiford's rights under the Fourteenth Amendment to the United States Constitution.

69.     The acts of excessive force by Defendant Remus against Pettiford were the direct and proximate cause of physical injuries and pain and suffering to Pettiford.

70.     The conduct of Defendant Remus was willful and exhibited a flagrant disregard for Pettiford's federally secured due process rights.  Accordingly, Defendant Remus is liable to Pettiford under 42 U.S.C. § 1983.

## COUNT II

### Section 1983 Claim Against Defendant Edwards
### For Deliberate Indifference To Medical Needs

71.     The allegations of paragraphs 1 through 65 are incorporated herein by reference.

72.     As described above, Defendant Edwards failed to ensure that Pettiford received prompt and adequate medical care subsequent to the beating he received on February 24, 1999.

18

73.     The actions of Defendant Edwards exhibited deliberate indifference to Pettiford's serious medical needs, were performed under color of state law, and violated Pettiford's rights under the Fourteenth Amendment to the United States Constitution.

74.     As a direct and proximate result of the actions of Defendant Edwards in failing to ensure that Pettiford received prompt and adequate medical care, Pettiford was subjected to increased pain and the threat of serious physical injury.

75.     The conduct of Defendant Edwards was willful and exhibited a flagrant disregard for Pettiford's federally secured rights. Accordingly, Defendant Edwards is liable to Pettiford under 42 U.S.C. § 1983.

## COUNT III

### Section 1983 Claim Against Defendant Sheahan
### For Cover Up By Sheriff's Office Employees

76.     The allegations of paragraphs 1 through 65 are incorporated herein by reference.

77.     As described above, the actions of Defendant Sheahan and numerous CCDOC employees acting pursuant to an official policy of covering up the use of excessive force were performed under color of state law, and violated Pettiford's rights guaranteed under the First and Fourteenth Amendments to the United States Constitution.

78.     The actions of Defendant Sheahan and numerous CCDOC employees acting pursuant to an official policy of covering up of acts of excessive force rendered hollow Pettiford's right to pursue an underlying claim effectively, denying him remedies that are not available in the present lawsuit. As a consequence of defendants' conduct, Pettiford has been denied the opportunity to sue and seek damages from Officers Hampton, Martinez, Garcia, and

19

Rosario, as well as from the SORT officer who hit him with a baton, and he has lost the opportunity to present the fullest evidence supporting his claim against Defendant Remus.

79.     The conduct of Defendant Sheahan and the CCDOC employees who carried out the cover-up policy was willful and exhibited a flagrant disregard for Pettiford's federally secured due process rights.   Accordingly, Defendant Sheahan is liable to Pettiford under 42 U.S.C. § 1983.

### COUNT IV

**Section 1983 Claim Against Defendant Cook County**
**For Cover Up By Cook County Employees**

80.     The allegations of paragraphs 1 through 65 are incorporated herein by reference.

81.     As described above, the actions of Defendant Cook County and its employees in covering up the use of excessive force by Defendant Remus and other SORT members pursuant to an official policy of the Cook County Sheriff's Office and of Cook County were performed under color of state law, and violated Pettiford's rights guaranteed under the First and Fourteenth Amendments to the United States Constitution.

82.     The actions of Defendant Cook County and its employees as described above acting pursuant to an official policy of covering up of acts of excessive force rendered hollow Pettiford's right to pursue his underlying claim effectively, denying him remedies that are not available in the present lawsuit.   As a consequence of defendants' conduct, Pettiford has been denied the opportunity to sue and seek damages from Officers Hampton, Martinez, Garcia, and Rosario, as well as from the SORT officer who hit him with a baton, and he has lost the opportunity to present the fullest evidence supporting his claim against Defendant Remus.

20

83.     The conduct of Defendant Cook County and its employees was willful and exhibited a flagrant disregard for Pettiford's federally secured due process rights. Accordingly, Defendant Cook County is liable to Pettiford under 42 U.S.C. § 1983.

## COUNT V

### Indemnification Claim Against Defendant Cook County

84.     The allegations of paragraphs 1 through 65 are incorporated herein by reference.

85.     Pursuant to 745 ILCS 10/9-102 and 55 ILCS 5/46-3 and 5-1106, Defendant Cook County is empowered and directed to pay any tort judgment for compensatory damages (and any associated attorneys' fees and costs) for which an independently elected Cook County officer such as Defendant Sheahan or any of his deputies acting within the scope of their employment is found liable.

86.     Defendant Cook County is liable for any judgment entered against Defendants Sheahan, Remus, and/or Edwards for compensatory damages and for the associated attorneys' fees and costs.

87.     In the event a judgment for compensatory damages is entered against any of these defendants, Defendant Cook County must pay the judgment, as well as the associated attorneys' fees and costs.

WHEREFORE Pettiford requests that this Court grant him the following relief, jointly and severally against the named defendants:

A.     judgment for compensatory damages against all defendants in an amount to be determined at trial;

B.     judgment for punitive damages against Defendants Remus and Edwards in an amount to be determined at trial;

21

C.   judgment reflecting the amount Pettiford would have received had he been able to name as defendants officers Hampton, Garcia, Martinez, and Rosario, as well as the officer who hit him with the baton, and judgment reflecting the amount he would have received from Defendant Remus had the full evidence supporting his claim against Remus not been covered up;

D.   an award of the costs of this action against all defendants, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

E.   an order requiring Defendant Cook County to pay any judgment for compensatory damages entered against Defendants Sheahan, Remus, and/or Edwards, as well as the associated attorneys' fees and costs; and

F.   such other and further relief the Court deems appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

DATED: December 2, 2004                          Respectfully submitted,

                                                 Cello L. Pettiford

                                                 By: _David J. Weissman_
                                                       One of his attorneys

David J. Bradford
R. Douglas Rees
David I. Weissman
Christopher S. Norborg
John B. Thornton
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

Jean Maclean Snyder
Law Office:  Jean Maclean Snyder
4845 S. Kenwood Avenue
Chicago, Illinois 60615-2015
(773) 285-5100

22

## CERTIFICATE OF SERVICE

I, David I. Weissman, an attorney, hereby certify that I caused a true and correct copy of the foregoing **Fifth Amended Complaint** to be served on all counsel of record listed below, via messenger delivery, on this 2nd day of December, 2004.

Steven M. Puiszis
James P. Navarre
Frank J. Marsico
Christopher G. Markey
Matthew P. Walsh, II
Hinshaw & Culbertson
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601

Kenneth E. Rechtoris
Daniel J. Hayes
Abram I. Moore
Bell Boyd & Lloyd LLC
Three First National Plaza
70 West Madison Street
Suite 3000
Chicago, Illinois 60602

Louis R. Hegeman
Jeffrey S. McCutchan
Paul A. Castiglione
Assistant State's Attorneys
Cook County State's Attorney's Office
500 Richard J. Daley Center
Suite 542
Chicago, Illinois 60602

Dana L. Kurtz
Kurtz Law Offices, LLC
75 East Wacker Drive
Suite 700
Chicago, Illinois 60601

David I. Weissman